33361. ALDERMAN v. THE STATE.

BOWLES, Justice.

The appellant, Jack Alderman, was indicted by a Chatham County Grand Jury for the offense of murder. He was tried by a jury and found guilty of the offense. The jury found as statutory aggravating circumstances that

the murder was "committed for the purpose of receiving money or any other thing of monetary value" (Code Ann. § 27-2534.1 (4)) and, that the offense of murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Code Ann. § 27-2534.1 (7). The appellant was sentenced to death by electrocution. Appellant's amended motion for new trial was overruled, and his case is now before this court on appeal and for our mandatory review of the death sentence imposed.

## I. Summary of the Evidence

The state presented evidence from which the jury was authorized to find the following:

On the afternoon of September 19, 1974, the appellant approached John A. Brown, a close friend, and asked for his assistance in the killing of appellant's wife, Barbara J. Alderman. The appellant told Brown that if he helped he would split one-half the proceeds of his wife's life insurance policy with him. At first Brown thought Alderman was only "kidding," but Alderman's persistence convinced Brown that he was serious.

Two days later the appellant called Brown and asked him to come over to his apartment in Chatham County. When Brown arrived the appellant handed him a 12-inch crescent wrench and told him, "it had to be done...all you have to do is hit her with the wrench." Brown hesitated, but after the appellant threatened him with a gun, Brown proceeded into the dining room where he struck Mrs. Alderman in the back of the head with the wrench. Mrs. Alderman screamed and ran into the living room where she was tackled by her husband. He held her down, and with Brown's assistance, attempted to strangle her. After she passed out, the appellant asked Brown if he thought she was dead. When Brown said "yes" the appellant said "well, stay here with her while I go open the bathroom door." Brown asked what for and the appellant replied "I'm going to drag her in there and drown her. . . I want to make sure that she doesn't do anything." Mrs. Alderman's body was then dragged into the bathroom and placed in the bathtub.

The appellant started running water in the tub while

Brown attempted to clean bloodstains from the carpet where Mrs. Alderman's body had fallen. Brown then went back into the bathroom and saw Mrs. Alderman in the bathtub with water just over her face.

Brown and the appellant changed clothes and left the apartment. They stopped at a Piggly-Wiggly store where Alderman got $100 which he gave Brown for his help. From there they went to a bar and started drinking. At around 10 p.m. Brown and the appellant returned to the apartment. Mrs. Alderman's body was still in the bathtub, but only a small amount of water remained in the bottom of the tub. They picked her up out of the tub, put her body on a quilt and rolled her up in it. Her body was then placed in the trunk of her car. Brown drove the car while Alderman followed behind on a motorcycle. They drove to Rincan, Georgia, in Effingham County. When they arrived at Dasher Creek, Mrs. Alderman's body was taken out of the trunk and put in the driver's seat of her automobile. Brown put the vehicle in drive and released the emergency brake. The car rolled into the creek. Before leaving, Brown opened the door to permit the body to fall out. The two then departed on the motorcycle.

At trial the appellant testified in his own behalf. He denied having anything to do with the death of his wife. He testified that on the night in question he and his wife had engaged in a conversation concerning her inability to become pregnant. She had told him that because she was only half a woman she was going to leave him to allow someone else to better fill her position. She grabbed her pocketbook and went out the back door. Appellant testified that at approximately 7 p.m. he left the apartment and caught a bus to get a drink. He returned home at approximately 10 p.m. but his wife was not at home. He then decided to go to Rincan, where Mrs. Alderman's grandmother resided, in order to apologize to his wife. The appellant testified that when he crossed the bridge at Dasher Creek, he saw his wife's car in the creek. The door was open and his wife's body was lying under water. The appellant testified that she was dead. When he heard a car coming he got on his motorcycle and returned to a bar in Savannah. Appellant testified that he did not know why he had left his wife's body in the creek; that he

recalled nothing of his trip back to Savannah; and, the fact that his wife was dead had completely left his mind. Appellant testified that he first realized the full facts surrounding his wife's death after being treated by a psychiatrist who was able to bring back his memory as to the events of that night. He stated that after being treated he realized that fear had caused him to leave his wife's body in the creek because he knew her family would blame him for her death.

The evidence will be examined in more detail as necessary in addressing appellant's enumerations of error.

## II. Enumerations of Error

1. The appellant contends that the trial court improperly excused five prospective jurors in violation of Witherspoon v. Illinois, 391 U. S. 510 (88 SC 1770, 20 LE2d 776) (1968).

Prior to the individual voir dire, the court asked each panel of jurors, "Are you conscientiously opposed to capital punishment?" Two jurors responded affirmatively. The court then asked these two jurors, "Are your reservations against capital punishment such that you could never vote for capital punishment, regardless of what the facts show?" Again both responded affirmatively.

It is clear from their answers that these two jurors would have automatically voted against the imposition of capital punishment without regard to the evidence that might have been developed in the case. Under Witherspoon, supra, it was not error to dismiss these two jurors for cause.

The exclusion of three other jurors presents an issue yet to be decided either by this court or the Supreme Court of the United States. During the individual voir dire, three jurors reaffirmed that they were not conscientiously opposed to capital punishment. The state then asked each one whether, if elected to serve as foreman of the jury, following the court's instructions, they would be able to write out the death penalty on the indictment and sign their name to it as foreman. Each of these three prospective jurors responded that if elected foreman, *they could not write out a death verdict*. Over appellant's

objection, the court excused these three jurors for cause.

Appellant contends that the exclusion of these three jurors for cause was in violation of Witherspoon, supra. Assuming, without deciding, that the exclusion for cause of these jurors was in violation of Witherspoon, supra, we find no error under the circumstances surrounding their exclusion.

Under Code Ann. § 59-805, a "person indicted for a crime or offense which may subject him to death or imprisonment in the penitentiary for not less than four years may peremptorily challenge 20 of the jurors impaneled to try him. . .; and the State shall be allowed one-half the number of peremptory challenges allowed to the prisoner." In the instant case when the twelfth juror was selected, the state had exercised only seven of its ten peremptory challenges. Thus, when the jury was empaneled, the state was left with three *unused* peremptory challenges.[1]

---

[1] We note that following the selection of the twelfth juror, the voir dire continued in order for two alternate jurors to be selected. Code Ann. § 59-907 provides that "[T]he State shall be entitled to as many peremptory challenges to such alternate jurors as there are alternate jurors called. The defendant shall be entitled to additional peremptory challenges in an amount twice greater than the additional peremptory challenges of the State. The peremptory challenges allowed to the State and defendant in such event *shall be in addition to the regular number of peremptory challenges allowed in criminal cases* to the defendant and State as now provided by law." In the selection of two alternate jurors the state was entitled to two peremptory challenges, the defendant four. When the second alternate juror was selected the state had only exercised one of its two peremptory challenges thus leaving the state with one additional challenge. The two alternate jurors were sequestered after the charge of court and eventually dismissed. They did not participate in either the verdict convicting the appellant of the offense charged or the verdict sentencing him to death by electrocution.

It is the state's contention that even if the trial court erred in excluding these three prospective jurors for cause, the appellant was not prejudiced by their exclusion since the number of jurors that arguably had been erroneously excluded for cause did not exceed the number of peremptory challenges which the state could have exercised had the trial court denied the state's motions to excuse these three jurors for cause. Stated more simply, we are presented with the narrow question of the impact on Witherspoon of unexercised peremptory strikes available to the state.

This same issue attracted the United States Supreme Court's attention in Moore v. Illinois, 403 U. S. 953 (1971). In that case, the Supreme Court of the United States granted certiorari on the issue, inter alia, of whether a death sentence could be affirmed "on the ground that the prosecution had sufficient peremptory challenges to have eliminated those prospective jurors eligible to serve under Witherspoon?"[2] However, because of the intervening decision in Furman v. Georgia, 408 U.S. 238 (92 SC 2726, 33 LE2d 346) (1972),[3] this issue was never decided by the court. Moore v. Illinois, 408 U. S. 786, 800 (92 SC 2562, 33 LE2d 706) (1972).

---

[2] In People v. Moore, 42 Ill. 2d 73 (246 NE2d 299) (1969), the Supreme Court of Illinois held that even if jurors were excluded on grounds that they had scruples against capital punishment in violation of Witherspoon the defendant was not deprived of his right to a fair trial in view of the tenor of the voir dire examination and the fact that if the trial court had not excluded such jurors, the prosecution had sufficient peremptory challenges to have these jurors struck from the panel.

[3] Furman v. Georgia, 408 U. S. 238 (92 SC 2726, 33 LE2d 346) (1972) held that the death penalty as then administered in this state "constitute[s] cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." However, our death penalty statute was amended after Furman v. Georgia and held to be constitutional in Gregg v. Georgia, 428 U.S. 153 (96 SC 2909, 49 LE2d 859) (1975).

The impact of unexercised peremptory challenges on a Witherspoon issue was not before the court in Davis v. Georgia, 429 U.S. 122 (97 SC 399, 50 LE2d 339) (1976), however the dissenting Justices in that case recognized that "Witherspoon does not decide whether the presence of unexercised peremptory challenges might render harmless the improper exclusion of a limited number of veniremen." The issue of unexercised peremptory strikes and its impact on Witherspoon is thus an open question.

In reaching a decision in this case, we are persuaded by the state's contention that it would be folly for an attorney to unsuccessfully challenge a juror for cause and then fail to utilize an available peremptory challenge in order to strike that juror from the panel. In the instant case the record supports the state's contention. During the voir dire examination in this case, the state challenged one prospective juror for cause who was wavering upon the issue of capital punishment. After the state's challenge for cause was denied by the trial court the state promptly exercised one of its ten peremptory challenges in order to strike the juror from the panel.

When the twelfth juror in this case was selected, the state had three peremptory challenges remaining and, therefore, the exclusion of the three complained of jurors for cause, if error at all, was harmless. See Chapman v. California, 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967). The presence of unused peremptory strikes by the state forecloses appellant's reliance on Witherspoon.

Appellant's enumeration of error is, therefore, without merit.

2. The appellant contends that the trial court erred in denying his motion for a continuance on grounds of the absence of a witness who was "subpoenaed but not served."

Code Ann. § 81-1410 sets out eight statutory requirements each of which must be shown by the moving party in order for a continuance to be granted because of the absence of a witness. *Fouts v. State,* 240 Ga. 39 (239 SE2d 366) (1977); *Beasley v. State,* 115 Ga. App. 827 (1) (156 SE2d 128) (1967).

It is well recognized that "[A] motion to continue is

addressed to the sound discretion of the trial judge, and this court will not interfere unless it is clearly shown that he has abused his discretion. *Corbin v. State,* 212 Ga. 231 (1) (91 SE2d 764) (1956). Where the moving party fails to make a proper showing of the requirements set forth in Code Ann. § 81-1410, the denial of a continuance motion cannot be said to be an abuse of discretion. *Scoggins v. State,* 98 Ga. App. 360 (106 SE2d 39) (1958)." *Harris v. State,* 142 Ga. App. 37 (3) (234 SE2d 798) (1977).

In the instant case, appellant's motion for continuance did not comply with the requirements set forth in Code Ann. § 81-1410, and, therefore, the trial court did not abuse its discretion in denying appellant's motion.[4]

3. Appellant contends that the trial court erred in allowing the state to reveal to the jury that, during an interview with a GBI agent, the appellant exercised his right to an attorney and remained silent.

On direct examination by the state, GBI agent H. H. Keadle testified that following identification of his deceased wife at the Effington County Hospital, appellant was taken to the sheriff's office and there interviewed by him. The following colloquy then occurred:

"Q. [By the Prosecutor] Was Mr. Alderman in custody at that time, under arrest, *or were you simply discussing with him this unfortunate occurrence?*

"A. [By GBI Agent Keadle] At first, we were simply *discussing it and trying to find out a little bit of background,* when he had last seen her (his wife) and one thing and another like that *when the interview began.*

"Q. Sir.

"A. When the interview began, we were trying to run down some preliminary things, when he had last seen her, you know, the routine things that you would on an investigation; *that was when the interview began.* Of

---

[4] Although the trial court failed to grant appellant's motion for a continuance, it did direct the sheriff to attempt to locate the witness. The appellant could ask for no more under these circumstances.

course, *it wasn't until the termination of the interview* that the stains I mentioned earlier were noticed.

"Q. Mr. Keadle, when you observed these stains that you have referred to, these reddish-brown stains on Mr. Alderman's trousers and I believe you said something similar in appearance on his belt, did you call these to his attention or discuss it with him or ask him what it was or anything?

"A. Shortly before that, we, of course as I said *we began with the preliminary just trying to get the background for the investigation started.* How long it had been since he had seen her and one thing and another like that, and then toward the end of the interview, he became sort of frustrated with the nature of the questions being asked him, *and he decided at that time he would exercise his right to an attorney, and so at that time the interview was just terminated when he stated that he wished to remain silent. He was asked no questions regarding the stains. . .*" (Emphasis supplied.)

Although the appellant's counsel made no objection at trial to either the district attorney's question or the GBI agent's response, he now contends on appeal, citing Doyle v. Ohio, 426 U. S. 610 (96 SC 2240, 49 LE2d 91) (1976); United States v. Hale, 422 U. S. 171 (95 SC 2133, 45 LE2d 99) (1975), and Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), that the agent's testimony infringed upon his constitutionally protected right to remain silent.

Appellant's failure to object below to the admission of the complained of testimony constitutes a waiver, and appellant cannot now complain on appeal. *Reeves v. State,* 241 Ga. 44 (243 SE2d 24) (1978); *Campbell v. State,* 240 Ga. 352 (8) (240 SE2d 828) (1977); *Sheffield v. State,* 235 Ga. 507 (220 SE2d 265) (1975). Accord, Wainwright v. Sykes, 433 U. S. 72 (97 SC 2497, 53 LE2d 594) (1977).

Notwithstanding, even if considered on its merits, the appellant's enumeration of error is without merit. In United States v. Hale, supra, the defendant, after being arrested, remained silent during a "custodial interrogation." At trial the prosecutor used the defendant's silence in an attempt to impeach the alibi

advanced by the defendant. Framing the issue as an evidentiary question and thus avoiding the constitutional issue, the United States Supreme Court found the probative value of the defendant's pre-trial silence outweighed by the prejudicial impact of admitting it into evidence. The court noted that although silence in the face of an accusation does normally have probative value insofar as it is assumed that an ordinary man will deny an untrue charge, an arrestee's situation is different, "for he is under no duty to speak and . . .has ordinarily been advised. . . that he has a right to remain silent, and that anything he does say can and will be used against him." United States v. Hale, supra, at 176. In addition, the court noted that there may be other explanations for the defendant's silence, stemming from "inherent pressures of in-custody interrogation."

One year later, in Doyle v. Ohio, supra, the United States Supreme Court held that the use for impeachment purposes of a defendant's silence, *at the time of his arrest and after receiving Miranda warnings,* violated the due process clause of the Fourteenth Amendment. Doyle reached the same result as Hale but in Doyle, the Supreme Court based its decision on constitutional grounds. In Doyle, the court quoted approvingly from Justice White's concurrence in United States v. Hale, supra, which recognized that "when a person under arrest is informed, as Miranda requires, that he may remain silent, that anything he says may be used against him . . . it does not comport with due process to permit the prosecution during the trial *to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time,* as he was told he need not do, *an unfavorable inference might be drawn* as to the truth of his trial testimony." (Emphasis supplied.) Doyle, supra, at 619.

The instant case is clearly distinguishable from both Hale and Doyle. In both of those cases, the defendant's *post-arrest, post-Miranda* silence was used for *impeachment purposes.* Here, the defendant was not under arrest when his interview with the GBI agent began, nor do the facts disclose a "custodial-interrogation" as contemplated by Miranda v. Arizona,

384 U. S. 436 (1966), supra.[5] Further, Agent Keadle's testimony was not used for impeachment purposes. The complained of testimony was elicited by the state upon *direct examination* in response to a question posed by the district attorney as to what the appellant said to Agent Keadle concerning the reddish-brown stains which were seen on appellant's pants. The testimony complained of was an unresponsive answer to the question posed by the district attorney. The district attorney did not stress appellant's silence in an attempt to infer guilt nor was the jury ever told that the appellant's silence could be used for impeachment purposes, much less evidence of guilt.

We further conclude that even assuming a violation of Doyle were to be found the issue would become academic under the circumstances in this case, inasmuch as any violation of appellant's due process rights was harmless beyond a reasonable doubt. See Chapman v.

---

[5] Miranda defines "custodial-interrogation" as "questioning initiated by law enforcement officers *after a person has been taken into custody* or otherwise deprived of his freedom of action in any significant way." Id. at 444. In the instant case, the GBI agent's testimony clearly shows that when appellant was taken to the station-house to be interviewed he was not in custody but was merely being asked general questions concerning his wife in order that the investigation into her death could begin. Appellant was not then a suspect in the case. It was not until after the appellant stated he wished to remain silent that the stains on his pants were noticed by the officers and at that point the appellant became a suspect in the case and taken into custody. Anything said prior to appellant's being taken into custody would be admissible even in the absence of Miranda warnings. See Oregon v. Mathiason, 429 U. S. 492 (97 SC 711, 50 LE2d 714) (1977); People v. Yukl, 25 NY2d 585 (307 NYS2d 857, 256 NE2d 172) (1969); cert. den. 400 U. S. 851 (91 SC 78, 27 LE2d 89) (1970); People v. Neulist, 72 Misc. 2d 140 (338 NYS2d 794) (1972); Smith, The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation, 25 S. C. L. Rev. 699, 728 (1974); Annot., 31 ALR 3d 565, 638 (1970).

California, 386 U. S. 18, supra.

The Supreme Court in Doyle, supra, reversed defendant's conviction; however, the opinion clearly suggests that the result might have been different had the state claimed that the impeachment use of silence, in the circumstances of that case, was harmless error.[6] This allusion to harmless error is not authority for applying that doctrine, but rather expressly reserved that issue.

In United States v. Davis, 546 F2d 583 (5th Cir. 1977), an infraction of the Doyle rule was found but that violation held to constitute harmless error. In that case the court noted that the prosecutor did not "focus on" or "highlight" defendant's silence in his cross examination and closing remarks, nor did the prosecutor's comments strike at the "jugular" of the defendant's story.

Again, in Chapman v. United States, 547 F2d 1240 (5th Cir. 1977), the court found a violation of Doyle to be present but that violation was held to be harmless error. In Chapman, the prosecutor, on direct examination of an arresting officer, asked the witness a question which elicited the fact of defendant's silence at the time of his arrest. Neither the prosecutor nor any prosecution witness tied together the fact of defendant's silence with his improbable story. The jury was never told that silence could be used for impeachment purposes. Neither in cross examination nor in argument did the prosecutor suggest that silence impeached the defendant's trial testimony. The court found any violation of Doyle to be harmless beyond a reasonable doubt, noting that "when there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error." Id. at 1250. See

---

[6] The court stated in Doyle: "The State has not claimed that such use in the circumstances of this case might have been harmless error. Accordingly, petitioners' convictions are reversed. . ." 426 U. S. at 619, 96 SC at 2245.

United States v. Sklaroff, 552 F2d 1156 (5th Cir. 1977); Meeks v. Havener, 545 F2d 9 (6th Cir. 1976).

In the instant case, there was only one reference to the defendant's silence and that reference was neither made nor elicited by the prosecutor, but instead resulted from a spontaneous remark made by the witness. The prosecution never again mentioned the witness' comment nor was the jury ever told that the appellant's silence could be used for either substantive or impeachment purposes. This case does not present a prosecutorial focus by repetitive questioning on defendant's silence as in Doyle. Nor did the prosecutor "focus on" or "highlight" appellant's silence so as to constitute prejudicial error. Therefore, any error, if at all, was harmless beyond a reasonable doubt.

For these reasons, appellant's enumeration of error is wholly without merit.

4. Appellant contends that the trial court erred in permitting the state, through the testimony of a GBI agent, to "fortify" the testimony of a key witness, John Brown, by reference to the propounded use of a polygraph test.

On direct examination by the state, the district attorney asked the GBI agent whether John Brown had taken a lie detector test. In response, the agent testified, "[T]he full test, no, sir. He went into the room, but he was not actually administered the test. The preliminaries were gone through, but the test was not actually administered."

The appellant contends that the above testimony was highly prejudicial because it tended to bolster John Brown's later testimony which incriminated the appellant.

It is clear from the testimony that a polygraph examination was never administered to Brown. Under these circumstances, Brown's latter testimony could not have been "fortified" by reference to a polygraph examination which, in fact, had never been taken. The agent's reference to a polygraph examination had no probative value and did not bolster Brown's credibility.

Appellant's enumeration of error is, therefore, without merit.

5. Appellant contends that the trial court erred in overruling his motion for a directed verdict on the state's failure to prove venue.

At trial, John Brown, appellant's accomplice, testified that the initial blow to the victim's head, the attempted strangulation, and the placing of the victim's body in the bathtub all occurred in appellant's apartment in Chatham County, Georgia. The body remained motionless after the initial attack for a period of time while the appellant and his accomplice went out for a few drinks. Brown testified that when they returned to the apartment they removed Mrs. Alderman's body from the bathtub, "she was cold; I believe she was dead." Her body was "kind of a little bit stiff. . .," thus, signs of rigor mortis were already present.

It is well recognized in this state that slight evidence is sufficient to establish venue, where there is no conflicting evidence. *Johns v. State,* 239 Ga. 681, 682 (238 SE2d 372) (1977); *Aldridge v. State,* 236 Ga. 773, 774 (225 SE2d 421) (1976). Further, circumstantial as well as direct evidence may be used to establish venue. *Loftin v. State,* 230 Ga. 92, 94 (195 SE2d 402) (1973). Venue is a question to be decided by the jury and its decision will not be set aside so long as there is any evidence to support it. *Johns,* supra; *Wilkes v. State,* 238 Ga. 57 (230 SE2d 867) (1976).

Although Mrs. Alderman's body was found by others in a creek in Effingham County, there was no evidence that she was murdered there.

The evidence at trial was sufficient to authorize the jury's finding that venue was in Chatham County. Appellant's enumeration of error regarding lack of venue is without merit.

6. Appellant contends that the trial court erred in failing to grant his motion for a directed verdict on grounds that the testimony of appellant's accomplice, John Arthur Brown, was uncorroborated.

"In Georgia, the testimony of an accomplice used to convict the accused of a crime must be supported by independent corroborating evidence as to the identity and participation of the accused tending to connect him to the crime or leading to the inference that he is guilty. Code

Ann. § 38-121; *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *West v. State,* 232 Ga. 861 (2) (209 SE2d 195) (1974)." *Eubanks v. State,* 240 Ga. 544 (242 SE2d 41) (1977). The sufficiency of evidence corroborating the testimony of an accomplice is a matter for the jury, and so long as the verdict is supported by "slight evidence" of corroboration connecting the defendant with the crime, this court will not say that the evidence did not authorize the verdict. *Lindsey v. State,* 227 Ga. 48, 52 (178 SE2d 848) (1970).

In the instant case, the accomplice's testimony was amply corroborated in several particulars. A forensic serologist from the Georgia Crime Laboratory testified that the blood type of the stains found on the appellant's trousers matched the blood type of the victim. There was testimony concerning a motorcycle kickstand impression where the victim's body was found, as well as testimony from a witness who stated that as he drove toward the creek a motorcycle passed by in the opposite direction, and on the left hand side of the motorcycle he saw something white flapping in the wind. Defendant owned a motorcycle and admitted driving his motorcycle to the creek scene on the night in question. This evidence corroborated the accomplice's testimony that he and the appellant had departed the scene on a motorcycle and that the appellant was holding the quilt in which Mrs. Alderman's body had been wrapped.

The corroborating evidence was sufficient to support the jury's verdict. Appellant's enumeration of error is, therefore, without merit.

7. Appellant contends that the trial court erred in refusing to permit the defense to complete examination of their expert witness pertaining to the hypnotic treatment of the appellant.

Prior to the trial of this case the court instructed both counsel for the state and for the defendant to avoid all references to the hypnosis of the defendant, apparently relying upon our decision in *Emmett v. State,* 232 Ga. 110, 115 (205 SE2d 231) (1974), wherein we held that "the reliability of hypnosis has not been established and *statements made while [a] witness [is] in a trance are inadmissible.*" (Emphasis supplied.)

In the instant case, any reference to the hypnosis of the appellant was inadmissible, and, therefore, the trial court did not err in refusing defense counsel's request to examine their expert witness concerning this matter.

8. Appellant alleges that he was denied effective assistance of counsel. His contention is based upon the errors alleged in Divisions 2, 3, 4 and 7 of this opinion.

In *Pitts v. Glass,* 231 Ga. 638 (203 SE2d 515) (1974), this court adopted the standard for determining the effectiveness of counsel as enunciated in MacKenna v. Ellis, 280 F2d 592 (5th Cir. 1960). MacKenna, supra, recognized the constitutional right to assistance of counsel as meaning "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render and rendering *reasonably effective assistance.*" (Emphasis supplied.) MacKenna, supra, at 599.

Upon our review of the record of this case, we find, in light of the standard as set forth in *Pitts,* supra, that the appellant was not denied his constitutional right to effective assistance of counsel, and therefore, appellant's enumeration of error is without merit.

9. Appellant contends that the death penalty is unconstitutional. It was, however, upheld in Gregg v. Georgia, 428 U.S. 153 (96 SC 2909, 49 LE2d 859) (1976), and, therefore, appellant's enumeration of error is without merit.

### III. Sentence Review

In our sentence review we have considered the aggravating circumstances found by the jury and the evidence concerning the crime and the defendant introduced in court. We have reviewed the sentence as required by Ga. L. 1973, p. 159 (Code Ann. § 27-2537 (c) (1-3)), as we have in each case involving a death penalty imposed under this statute. We conclude that the sentence of death imposed on Jack Alderman was not imposed under the improper influence of passion, prejudice or any other arbitrary factor. Code Ann. § 27-2537 (c) (1).

The jury found as statutory aggravating circumstances that the accused committed the offense of murder for the purpose of receiving money or any other

thing of monetary value (Code Ann. § 27-2534.1 (b) (4)) and, that the offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim (Code Ann. § 27-2534.1 (b) (7)). The evidence supports the jury's findings in regard to the statutory aggravating circumstances. Further, we have thoroughly reviewed the instructions of the trial court during the sentencing phase of appellant's trial and find that the charge as given was not subject to the defects dealt with in our decisions in *Fleming v. State,* 240 Ga. 142 (240 SE2d 37) (1977) and *Hawes v. State,* 240 Ga. 327 (240 SE2d 833) (1977).

In reviewing the death penalty in this case, we have considered the cases appealed to this court since January 1, 1970, in which a death or life sentence was imposed for murder and we find that those similar cases set forth in the appendix support affirmance of the death penalty. Jack Alderman's sentence to death for murder is not excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. Code Ann. § 27-2537 (c) (3). The verdict is factually supported.

*Judgment and sentence affirmed. All the Justices concur, except Hall, J., who concurs specially in Division 3 and dissents as to Division 1 and the judgment, and Hill, J., who dissents.*

ARGUED MARCH 13, 1978 — DECIDED JUNE 27, 1978 — REHEARING DENIED JULY 6, 1978.

*John Wright Jones,* for appellant.

*Andrew J. Ryan, III, District Attorney, Robert M. Hitch, III, Assistant District Attorney, Arthur K. Bolton, Attorney General, B. Dean Grindle, Jr., Assistant Attorney General,* for appellee.

APPENDIX.

*Gregg v. State,* 233 Ga. 117 (210 SE2d 659) (1974); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1974); *Floyd v.*

*State,* 233 Ga. 280 (210 SE2d 810) (1974); *Mitchell v. State,* 234 Ga. 160 (214 SE2d 900) (1975); *Berryhill v. State,* 235 Ga. 549 (221 SE2d 185) (1975); *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976); *Dobbs v. State,* 236 Ga. 427 (224 SE2d 3) (1976); *Pulliam v. State,* 236 Ga. 460 (224 SE2d 8) (1976); *Birt v. State,* 236 Ga. 815 (225 SE2d 248) (1976); *Young v. State,* 237 Ga. 852 (230 SE2d 287) (1976); *Douthit v. State,* 239 Ga. 81 (235 SE2d 493) (1977); *Corn v. State,* 240 Ga. 130 (240 SE2d 694) (1977); *Thomas v. State,* 240 Ga. 393 (242 SE2d 1) (1977); *Stanley v. State,* 240 Ga. 341 (241 SE2d 173) (1977); *Campbell v. State,* 240 Ga. 352 (240 SE2d 828) (1977).

HALL, Justice, concurring specially in Division 3 and dissenting as to Division 1 and the judgment.

Under Georgia's contemporaneous objection rule, the appellant's enumeration of error relating to the admission of evidence in violation of Doyle v. Ohio, 426 U. S. 610 (1976) has been waived. *Reeves v. State,* 241 Ga. 44 (234 SE2d 24) (1978); *Sheffield v. State,* 235 Ga. 507 (220 SE2d 265) (1975). "It is well settled that an objection to the admission of evidence may not be raised for the first time on appeal." *McAllister v. State,* 231 Ga. 368 (202 SE2d 54) (1973). The Georgia contemporaneous objection rule is based upon both court rule (Code Ann. § 24-3362) and case law. *Andrews v. State,* 118 Ga. 1 (43 SE 852) (1903). The rule is applicable to constitutional questions. E.g., *Clenney v. State,* 229 Ga. 561, 563 (192 SE2d 907) (1972). The application of such a rule to constitutional issues was upheld by the Supreme Court of the United States in Wainwright v. Sykes, 433 U. S. 72 (97 SC 2497, 53 LE2d 594) (1977). That court held that where a state has a contemporaneous objection rule, failure to make timely objection to the introduction of a confession barred federal habeas corpus review absent a showing of cause for noncompliance and some showing of actual prejudice.

I dissent as to Division 1 of the majority opinion and the judgment. In my opinion, the exclusion of the three jurors for cause violated Witherspoon v. Illinois, 391 U. S. 510 (1972). See *Griggs v. State,* 241 Ga. 317 (245 SE2d 269) (1978); Davis v. Georgia, 429 U. S. 122 (1976); Harris v. Texas, 403 U. S. 947 (1971).

HILL, Justice, dissenting.

The majority find it difficult in a death case to overrule an enumeration of error solely because defendant's counsel failed to object at trial. So, regarding the GBI agent's testimony that the defendant exercised his right to an attorney and to remain silent, the majority first say that defendant's failure to object at trial precludes consideration of the Doyle issue on appeal.

Because the majority find it diffcult to dismiss this enumeration without considering it on its merits (and perhaps also because the defendant urges on appeal that the failure of his trial attorney to make an objection based on Doyle shows ineffective assistance of counsel), after saying that consideration of the Doyle issue is precluded, they nevertheless say that even if the Doyle issue were considered on its merits, it would be without merit.

After finding the Doyle issue to be without merit, the majority go further and conclude that even if there were a violation of Doyle, the error was harmless beyond a reasonable doubt. It seems to me that the majority is unsure of its basis for affirming this death penalty case.

First, as to the merits, the majority attempt to distinguish Doyle by saying it held that the use of the defendant's *post-arrest, post-Miranda* silence *for impeachment purposes* violates due process, but that here the defendant was not under arrest "when his interview with the GBI agent began," the facts do not show a custodial interrogation and the GBI agent's testimony was elicited by the state upon direct examination and not for impeachment purposes.

It is true that the defendant was not under arrest when the interview began, but he was under arrest when/ it ended. At some point the "interview" became "interrogation," because the defendant became frustrated with the nature of the questions being asked him. The GBI agent did not say when the interrogation began or when the Miranda warning was given. In its effort to distinguish Doyle, the majority therefore infer that the defendant here chose to exercise his right to remain silent and consult an attorney before he was arrested and before he was given his Miranda warning. That effort to

distinguish Doyle is based upon surmise rather than the record.

The emphasis on impeachment in Doyle v. Ohio, 426 U. S. 610 (96 SC 2240, 49 LE2d 91) (1976), was because no one contended that evidence as to the defendant's silence was admissible during the state's case in chief, because under Miranda such evidence was admissible, if at all, only for purposes of impeachment as in Oregon v. Hass, 420 U. S. 714 (95 SC 1215, 43 LE2d 570) (1975). The majority's attempt to distinguish Doyle as an impeachment case completely overlooks Miranda v. Arizona, 384 U. S. 436, 468 (n. 37) (86 SC 1602, 16 LE2d 694) (1966), where the court ruled: "In accord with our decision today, it is impermissible to penalize an individual for exercising the Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. Cf. Griffin v. California, 380 U. S. 609 (1965). . ."

In the case before us the testimony elicited by the state from a state law enforcement officer during the state's case in chief (and before the defendant testified) was probative only as to guilt; it was premature for impeachment purposes. To me it matters not that the state did not stress it, or that the jury was not told that the defendant's silence could be used as evidence of guilt. The prosecution used at trial the fact that the defendant claimed his privilege and that violated the defendant's right to remain silent as well as his right to counsel.

Thus, in my opinion we cannot say that defendant's enumeration of error based on Doyle v. Ohio is without merit. That leaves us with the failure to object at trial, with its follow-up criticism of trial counsel, and harmless error. Although plenary appellate review in criminal cases is being advocated, it is not being granted even in this death case. Cf. Code Ann. § 27-2537(i). Moreover, in my view we should not retreat to the contemporaneous objection rule unless we ourselves are willing to stand upon it, and it alone, in a death case.

Under our statute (Code Ann. § 50-127 (1)), it is clear that there has been no showing of waiver and the

defendant could have raised the Doyle issue on habeas corpus notwithstanding the absence of a contemporaneous objection. *Morgan v. Kiff,* 230 Ga. 277, 279 (196 SE2d 445) (1973); *Jacobs v. Hopper,* 238 Ga. 461 (1) (2) (233 SE2d 169) (1977); *Clark v. Smith,* 224 Ga. 766 (5) (164 SE2d 790) (1968), revd. 403 U. S. 946; Wilkes, Postconviction Habeas Corpus Relief in Georgia, 12 Ga. L. Rev. 249, 260 (n. 84), 272 (n. 144). It makes little sense to me to affirm a death sentence on appeal by invoking the contemporaneous objection requirement, where that requirement would not be applicable on habeas corpus.[1] The court's invocation of the contemporaneous objection rule in this case will suggest to defense counsel that they save their constitutional enumerations of error (excepting jury composition challenges, Code Ann. § 50-127(1), and Fourth Amendment violations, *Jacobs v. Hopper,* supra) for habeas corpus lest it be said on appeal that there was no contemporaneous objection or that the objection at trial was inadequate. Cf. *Shaw v. State,* 241 Ga. 308, 310 (1978). This court does not improve the operation of the criminal justice system by making habeas corpus more attractive than the normal appellate process. See *Moore v. State,* 141 Ga. App. 245, 248 (233 SE2d 236) (1977) (the state does not here urge the need for a hearing on waiver).

As for harmless error, I cannot agree with the majority and say that I find this error to be harmless beyond a reasonable doubt in this death penalty case. I therefore dissent as to the entirety of Division 3 of the majority opinion.

I also dissent to the first division where the majority, without using that phrase, finds harmless error in

---

[1] By using the contemporaneous objection rule as one basis for affirmance and "distinguishing" Doyle v. Ohio, supra, as an alternative basis, the majority may deter federal review of this conviction in deference to the first basis (see Williams v. Georgia, 349 U. S. 375, 211 Ga. 763), yet be able to say on state habeas corpus that we previously decided the constitutional (Doyle) question on its merits.

excusing for cause three prospective jurors in conceded violation of Witherspoon v. Illinois, 391 U. S. 510 (1968). The majority say that the impact of the state's having unexercised peremptory challenges equal to the number of Witherspoon violations is an open question. I disagree.

In Davis v. Georgia, 429 U. S. 122, 123 (97 SC 399, 50 LE2d 339) (1976), the court said in a per curiam opinion: "Unless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings' (391 U. S. at 522 n. 21), he cannot be excluded; if a venireman is improperly excluded even though not so committed, any subsequently imposed death penalty cannot stand." In reaching this conclusion the court cited Harris v. Texas, 403 U. S. 947 (1971), which reversed the death penalty affirmed in Harris v. State, 457 SW2d 903 (Tex. Crim. App.) (1970). In Harris one juror was improperly excluded; the state had 4 unused peremptory strikes (Tex. Code Crim. P. (Vernon's Ann.) art. 35.15); the death penalty was set aside. Harris v. Texas, supra.

In its analysis of Witherspoon, the Supreme Court of California in In re Anderson, 73 Cal. Rptr. 21 (447 P2d 117, 122) (1968), cert. den. 406 U. S. 971 (1972), used language similar to that quoted above from Davis v. Georgia. There the California court held that the defendant was entitled to have his death penalty set aside because jurors were improperly excluded for cause in violation of Witherspoon, notwithstanding the fact that the state had sufficient unused peremptory strikes to have removed such jurors.

As I read Davis v. Georgia, supra, the Supreme Court has approved In re Anderson, supra. As the dissent in Davis pointed out, the majority adopted a per se rule which precludes a finding of harmless error. 429 U. S. at 123-124. Additionally, the dissent urged that the state may have had an unused peremptory challenge in Davis. Notwithstanding the dissenter's charge that it was excluding consideration of harmless error, the majority of that court, citing Harris v. Texas, supra, adhered to its holdings: ". . . if a venireman is improperly excluded . . . any subsequently imposed death penalty cannot stand."

Id. at 123. The majority in this case have decided not to apply that statement as it is written. I therefore dissent.